Rick Lee EVANS *v.* STATE of Arkansas

CR 93-1316                                              878 S.W.2d 750

Supreme Court of Arkansas
Opinion delivered July 11, 1994

*Doug Norwood*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

STEELE HAYS, Justice. Rick Lee Evans was charged with the crime of incest [Ark. Code Ann. § 5-26-202 (Repl. 1993)], in that, being over the age of sixteen years, he engaged in sexual intercourse with his stepdaughter, B.R., between October 1990 and July, 1991. Evans was convicted and sentenced to three years in the Department of Correction. On appeal to this court Evans presents six points for reversal. Finding no error, we affirm the judgment appealed from.

### Trial Testimony

The following is an abridgement of the state's proof:

*Michael Ryan*, father of the prosecutrix, testified that he and B.R.'s mother divorced when B.R. was only a few months old; that in July, 1991, his daughter came to his home in Afton, Oklahoma, for a visit. She intended to stay for two weeks. She had

been there only three or four days when he came home and noticed she had been crying. She said Rick had called, he wanted her to come home and if she didn't he was going to kill himself. Ryan wondered what kind of man would make threats of that kind. That night Evans called again and asked if he could apologize to B.R. Ryan listened on an extension as Evans said he was sorry but then said he wanted her home, that he was lonesome and wanted her there at night to keep him company, that if she didn't come home tomorrow he would "blow his brains out." With that Ryan got on the phone and the two men had a heated exchange.

The episode caused Ryan to wonder whether Evans had molested his daughter. Next day he asked her about it; she denied any molestation, but had "a scared, hurt look, like she was afraid." With that Ryan resolved to get custody of B.R., he obtained temporary custody that summer and permanent custody in the fall. The following March, Ryan learned Evans had sexually abused her and he reported it to the Department of Human Services.

*Carol Anna Helm* testified that Michael Ryan was her brother and the two lived a block apart in Afton. Her daughter, Arlena, and her cousin, B.R., were "like sisters." In early March B.R. was spending the night with Arlena. She heard the girls talking and around midnight Arlena came into her bedroom crying hysterically, urging her to see about B.R. Mrs. Helm found the child on the floor of the dining room in a fetal position crying, " a crumpled mass of child." Mrs. Helm asked what was wrong and she said, "Rick raped me." She rocked the child for several hours and then called her brother to tell him.

*B.R.* testified that she was then sixteen-years-old and in the ninth grade at Afton. Arlena Helm, her cousin, was her best friend. Her mother had married Rick Evans, now forty-two, when she was seven; that Rick had been good to her, she called him "Dad," that she had loved him, that he had a temper and had threatened suicide.

B.R. testified Rick saw her looking at her mother's medical books and he started explaining things about male and female anatomy. He told her that the tip of a man's penis is "really sensitive if something goes wrong." These conversations made her

feel uncomfortable. In October, around her fourteenth birthday, she was in the bathtub with the door closed. Rick came in and said he'd show her how to wash. She said she already knew how, but he said he would show her better. Taking a washcloth, he washed her neck, back, buttocks, breast, vagina and "between my vagina." He gave her more baths, shaved her legs, underarms and vagina. She said she hadn't needed his help, nor wanted it, but did not know how to tell him to stop. One night after her bath he told her to go to his bedroom and get in bed. He then took off his clothes and engaged in sexual intercourse, removing his penis just before ejaculating. She said this continued on the nights when her mother worked up until July, 1991, when she went to Oklahoma. She testified to sexual intercourse in various positions, with oral sex included. She said that at times he ejaculated inside her, but more often he would take it out before ejaculating. He told her she would not get pregnant because he had had a vasectomy. She said she was afraid to tell her mother for fear that she would not believe her and because she felt it was her fault. She described one time when they were in the living room and Rick sucked on her neck. Next day at school her friends teased her about having a "hickey" and she then saw the mark on her neck.

*David Sears* testified he was B.R.'s uncle, her mother's brother; that during a visit he saw the hickey on B.R.'s neck and commented on it and Rick said, "we were just playing around." Sears spoke to his wife about it because he thought it wasn't proper.

*Detective Joseph Landers* introduced a taped interview with Rick Evans recorded on March 22, 1992, and the tape was played to the jury. Evans denied having had intercourse with his stepdaughter, but admitted to having given her baths and shaving her legs and threatening suicide if she did not come home:

Q: When she went to live with her dad I guess this upset you some from what your wife has told me and what B.R. has told me and caused you some problems. Is that right?

A: Caused big problems.

Q: Was there a point there where you threatened to

commit suicide if she didn't come home or . . . .

A: I may have in the heat of it said something like that. I know she knows I wouldn't. But I was quite upset.

Q: Okay. Well, she told me about a specific telephone conversation between you and her where you told her that you were lonely without her because her mother was gone at night and you needed her back home. And then you threatened to commit suicide if she didn't come back home. Do you remember that conversation.

A: I don't remember saying to her well, I'm going to kill myself.

Q: Do you remember the conversation I'm talking about. Does that ring a bell?

A. I remember talking to her, yeah.

Q: Okay. Tell me your version of that conversation.

A: I just asked her if she could come that weekend, which she'd been gone a week, and she agreed to come home. But I told her, I said, I want it to be your decision, not me making you come home.

Q: Is this the same conversation that her father broke in and. . . .

A: Yeah.

Q: And interrupted, he was apparently listening on the other end of the phone?

A: I don't know if he was listening.

Q: Okay. But he interrupted the conversation? In that conversation you don't remember saying anything like that, that you were lonely without her because mom was gone at night and you needed her there?

A: No, nothing like that.

Q: And that you were going to blow your brains out if she didn't come home or anything like that?

A: I didn't say anything like that, either. I didn't say specifically I was going to commit suicide. I may have said something in a round about way of it that, you know, like, I don't know, I didn't know if I could go on if she did decide to leave me, I didn't say well, I'm, going to commit suicide.

\* \* \* \* \*

Q: Well, I've got every reason in the world to believe her and every reason in the world not to believe you from what I've heard from everybody involved. I'm not saying, you know, that you should be hung for what happened. Okay? I think you've got some problems and maybe you need help with those problems. She's going to need help with the problems she's got now.

A: I guess I did it to her.

At the end of Detective Landers's testimony the state and the defense rested.

### Rape Shield Statute

Evans requested a pretrial hearing pursuant to the Arkansas Rape Shield Statute, Ark. Code Ann. § 16-42-101 (Repl. 1994). He proposed to introduce evidence that in her initial statement to the police, B.R. denied having had sex with anyone other than her stepfather, whereas a year later she informed the prosecutor that after she had gone to live with her father she had sexual intercourse "about ten times" with someone in Oklahoma. The state promptly notified the defense of this development and B.R. admitted at the hearing that she had originally lied to the police. At the close of the hearing the following colloquy occurred:

Court: My ruling would be, at least at this point, that the subsequent sexual conduct of the victim is not relevant and not to be inquired into.

Defense: Okay, your Honor. Is the Court making that ruling pursuant to this particular statute, on the Rape Shield Statute?

Court: I'm making it more as a matter of evidence and relevancy.

Defense: Okay. The Rape Shield Statute is— my understanding of the statute, it covers a particular class of cases, which incest is not in that class of cases.

Court: Right.

State: Your Honor, the Supreme Court has held in carnal abuse and incest cases that the Rape Shield Statute applies, so I don't see any problem there. I'd refer the Court to —

Defense: I don't think that's the law, Judge.

State: *Fields* v. *State*, which is a Supreme Court case, 281 Ark. 43, 661 S.W.2d 359. It's a 1983 Supreme Court case.

Court: Well whether it's under 16-42-101 or under the general rules of evidence, I don't think the subsequent sexual conduct of the — well, my ruling is that it is not admissible.

Later in the proceedings, counsel again asked whether the Rape Shield Statute applied to incest cases:

Defense: And the other thing is did the court rule that the Rape Shield Statute applies to incest cases?

Court: No, I didn't. You're the one that asked for the hearing.

Defense: I understand that, but I'm asking the Court now to tell me does the Rape Shield Statute cover incest cases.

Court: I've ruled that the testimony is not admissible and that's all I'm saying.

In drafting Ark. Code Ann. § 16-42-101 (Repl. 1994), the legislature specifically listed which offenses were to be included under the statute's umbrella of protection, and incest is not included. During the hearing, the prosecutor cited *Fields* v. *State*, 281 Ark. 43, 661 S.W.2d 359 (1983), for the proposition that the Rape Shield Statute does apply to incest. In *Fields*, we held that evidence of the victim's earlier sexual activity was not relevant in a case involving carnal abuse and incest. Carnal abuse is cov-

ered by the Rape Shield Statute, but incest is not. Evidently, the Rape Shield Statute's applicability to incest was not argued in *Fields*, and we failed to distinguish between the two offenses in that context in deciding the case.

Although the Rape Shield Statute does not purport to include incest within its protective curtain, the issue remains one of relevancy. In this case the trial court held that whether the victim had sexual relations with someone in Oklahoma after she moved there in July, 1991, and subsequent to the period during which incest was alleged to have occurred, had no relevance to whether she had had sexual relations with the appellant. The virginity of the prosecutrix in a sexual offense is not relevant per se. *Duncan* v. *State*, 263 Ark. 242, 565 S.W.2d 1 (1978). For the same reason, evidence of prior sexual conduct is inadmissible unless it involves the accused and then only if relevant to whether sexual intercourse was consensual. *Eskew* v. *State*, 273 Ark. 490, 621 S.W.2d 220 (1981). Since consent is never an issue in the crime of incest, whether this victim had subsequent sexual relations with another and whether she initially admitted or denied such conduct to investigating authorities is entirely collateral. Nothing in her direct testimony at trial was contradictory to her initial statement. Even if we could say there was relevance to this subsequent conduct, giving due deference to the trial court, as we are pledged to do, we cannot say that the probative value of such evidence was not substantially outweighed by the danger of unfair prejudice. A.R.E. Rule 403. Such matters are properly left to the sound discretion of the trial court. *Beed* v *State*, 271 Ark. 526, 609 S.W.2d 898 (1980).

## Impeachment

During Evans's cross-examination of the victim, she testified that she did not remember telling the prosecuting attorney that she had sustained abrasions from sliding on a waterbed while Evans was sexually abusing her. Evans claimed that he should have been permitted to call one of two deputy prosecutors to whom the victim allegedly made these statements in order to impeach her credibility.

As the state argues, the question of whether the victim did or did not receive burns from sliding on the waterbed is

collateral to the primary issue of whether Evans committed incest. We have consistently held that a witness cannot be impeached by extrinsic evidence on collateral matters brought out on cross-examination. *Garst* v. *Cullum*, 291 Ark. 512, 726 S.W.2d 271 (1987); *Powell* v. *State*, 260 Ark. 281, 540 S.W.2d 1 (1976). Therefore, the trial court did not commit error in refusing this request.

### Evidence of Appellant's Fertility

B.R. testified that Evans had told her that she did not need to worry about getting pregnant because he had undergone a vasectomy. Evans contends on appeal that it was error to disallow expert testimony that he was fertile, because such testimony would have questioned why the victim had not become pregnant after months of sexual intercourse with Evans. Any relevance of this proffered testimony is remote, at best, and because it had minimal probative value, to have excluded it from the trial is not error. A.R.E. Rule 103.

### Other Evidentiary Rulings

Appellant challenges three evidentiary rulings based on a lack of relevance. We do not reverse rulings on relevance unless we find an abuse of the trial court's discretion in the matter. *Hamblin* v. *State*, 268 Ark. 497, 597 S.W.2d 589 (1980). Evans contends that the trial court erred in not permitting his counsel to delve into the circumstances surrounding the victim's allegations of incest.

He also argues that he should have been allowed to question B.R. about the contents of a letter the victim received from a boy in Oklahoma, stating in crude language that he wanted to have sex with her. Evans offered the contents of this letter to illustrate that after learning of the letter, he and B.R.'s mother had exerted tighter controls over her and for this reason, he argues, she had levelled the incest charges against him. Evans did not have the letter itself, he simply wanted to use its contents. Clearly, the contents of this letter were hearsay and the trial court did not err in its ruling.

Evans submits it was error for the trial court to refuse to permit counsel to ask B.R., "In fact, you don't love your mother

any more, do you?" This question was intended to show that the incest charges against Evans were the result of B.R.'s anger against Evans and his wife. But, as the state explains, the child's relationship with her mother was adequately explored during the trial. She testified that she became upset when her mother did not take her for visitation on one occasion, and that she cried when her mother left her, adding, "I loved my mom then." What is relevant evidence and what is cumulative or prejudicial lies in the discretion of the trial court. *Loy* v. *State*, 310 Ark. 33, 832 S.W.2d 499 (1992); In *Qualls* v. *State*, 306 Ark. 283, 812 S.W.2d 681 (1991), we wrote:

> The trial courts ruling on relevancy is entitled to great deference and will be reversed only if the Court abused its discretion. *Walker* v. *State*, 301 Ark. 218, 783 S.W.2d 44 (1990).

No abuse of discretion by the trial court has been shown in these rulings.

For the reasons stated, the judgment is affirmed.

GLAZE, J., concurs.