AYDELOTTE *v.* STATE.

Opinion delivered March 22, 1926.

*Rogers & Robinson,* for appellant.

*H. W.* Applegate, Attorney General, and *Darden Moose,* Assistant, for appellee.

WOOD, J. G. W. Aydelotte was indicted for the crime of murder in the first degree by the grand jury of Pulaski County in the killing of one H. D. Edwards in Pulaski County, Arkansas. The testimony adduced by the State at the trial tended to prove that Aydelotte, on the night of September 24, 1925, came over from Memphis, where he resided, to Little Rock after his wife, who, with their two children, was visiting his

mother-in-law living at 1214 Rock Street, Little Rock, Arkansas. When Aydelotte arrived at the home of his mother-in-law, he ascertained that his wife was out with another man. He armed himself with a pistol and remained at his mother-in-law's house until his wife and Edwards came there. He met them on the sidewalk a short distance from the house. An altercation took place between him and Edwards, and the shooting occurred. Edwards was killed by Adyelotte. Witnesses for the State say that just before the shooting occurred they heard Mrs. Aydelotte say, "Oh, my God, Grady, don't do that!" and ran through the house. Then five shots were heard—first one shot and then four others in succession. After the shooting a lady's voice was heard to ask Aydelotte, "Why did you do that?" and he replied, "I don't know." After the shooting the police were summoned. They arrived in about ten minutes. Aydelotte came up to them and said, "I am the man who did the shooting. My God, I am sorry, but I had to shoot the boy; let's go and find him." They walked up the street together and found Edwards dead, lying in front of the corner house. An examination of the body showed that he was shot by a .32 pistol carrying steel-jacket bullets. One bullet entered his left side about an inch from the spine. There were five wounds, and Edwards died as a result of those wounds. There were no powder burns on Edwards' coat or trousers. Aydelotte told one of the officers that he shot Edwards; that the gun used by him belonged to his mother-in-law, and he said he was taking the gun home. He told another officer that he did the shooting—didn't know who the man was that he shot; that he killed the man on account of his wife— killed him because he was with his wife, and said, "You would have done the same thing." The officers asked him if Edwards had tried to kill him or assault him, and Aydelotte replied, "No." After the officers took him down to headquarters, he asked what the charge was against him, and they told him that it was murder, and he then stated that Edwards had jumped on him

and tried to kill him. The statements he made were voluntary. He also stated that the man jumped on him and caught him by the throat. One officer stated that the pistol with which the killing was done would have to be five or six feet away from the party killed or else it would show powder burns on him; at a distance of three feet it would show powder burns on the clothes. If the clothes were light, it would be more distinct than on dark clothes. Edwards had on dark clothes. There was no weapon of any kind found on Edwards.

Aydelotte gave one of the officers the pistol with which the killing was done. The doctor who examined the body of Edwards at the City Hospital stated that one bullet wound was in the middle of the back about the ninth or tenth vertebra, one or two in the lumbar region over the kidneys or liver, and one through the hip or thigh. This witness also testified that he didn't observe any powder burns on Edwards' clothing.

The testimony adduced by Aydelotte tended to prove that Mrs. Aydelotte was at the home of her mother, Mrs. Morse, where she had been about six weeks. Edwards had visited the house as often as four times a week. A witness who occupied a room down stairs next to the room of Mrs. Aydelotte heard conversations between Mrs. Aydelotte and Edwards. Mrs. Morse testified that Aydelotte married her daughter. He was living in Memphis, and his wife had been visiting witness for about six weeks. They received a telegram from Aydelotte, stating that he was coming to Little Rock, and his wife expected to return to Memphis with him. Aydelotte arrived about 7:15. His wife had left about ten minutes of seven with Edwards. Aydelotte wanted to know where his wife was, and witness told him that she was out, but didn't tell him whom she was with. Aydelotte went out twice trying to find her, and witness had tried to locate her several times, and finally told Aydelotte that his wife was with Edwards, and that Edwards had been going with her frequently. Edwards had threatened Aydelotte when witness had asked him to remain away from the

house; that Aydelotte might meet him there, and Edwards replied that he would be ready for him. When witness told Aydelotte these things, he seemed to be very nervous. The gun that Aydelotte shot Edwards with belonged to witness' husband. It had been in witness' trunk. She didn't see Aydelotte get the gun. Witness and Aydelotte were sitting on the front porch when Aydelotte's wife and Edwards came walking up the street together. Edwards had his arm around Mrs. Aydelotte, and kissed her. She was trying to get away from him, and pushed him away. They were advancing toward witness' home, and witness said to Aydelotte, "There is Hortense" (the name of Aydelotte's wife). When witness and Aydelotte started off the porch, Mrs. Aydelotte exclaimed, "There is my husband!" Just at that time she ran towards witness, and exclaimed, "Oh, my God." Aydelotte met Edwards and spoke to him, and Edwards grabbed at his throat. They struggled and fell to their knees, and two shots were fired. After a slight intermission the other shots were fired. This witness denied that she or Mrs. Aydelotte asked Aydelotte why he did it, and stated that he did not answer "I don't know." Witness told Aydelotte that Edwards' visits to his wife were frequent, and witness saw Edwards caress and kiss Aydelotte's wife. Witness didn't see Edwards with any weapon. When the first two shots were fired, Aydelotte and Edwards were facing each other. Edwards had grabbed Aydelotte by the collar and they had clinched before any shots were fired.

Several witnesses testified that Aydelotte's reputation as a peaceable, moral and law-abiding citizen was good.

Aydelotte himself testified that he came over to Little Rock for his wife and two babies, who had been visiting his mother-in-law, Mrs. Morse. His testimony is substantially the same as that of Mrs. Morse as to the threats, the meeting with Edwards, and the fatal rencounter. He stated that Mrs. Morse told him that Edwards had said to her, "If he ever catches me with his

wife, I will be prepared and ready for him." Witness went into Mrs. Morse's trunk and got the pistol. Witness stated that when he faced Edwards he had never seen him before, and asked him what he was doing with his wife. Edwards didn't say a word, but grabbed at witness' throat, and it looked to witness like his other hand went to his hip pocket. Witness thought he was going after something, and pulled out the gun. Edwards then grabbed the gun with the hand he had on witness' throat, and witness fired two shots. They were on their knees when the last shots were fired. Witness didn't intend to use the pistol, and did so only because Edwards grabbed at him and tried to kill him. Witness didn't know where the bullets struck the deceased and didn't know what position he was in. Witness denied that he told the officers that the pistol was brought from Memphis and didn't tell them he shot Edwards because he was with witness' wife.

The court instructed the jury on its own motion, and among other prayers for instructions asked by counsel for Aydelotte was the following:. "No. 7. You are instructed that a person about to be attacked is not bound to wait until his adversary gets 'the drop on him or draws a bead on him' before he takes steps to prevent those occurrences from taking place. When a person apprehends that some one is about to do him great bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, he may safely act upon appearances, and even kill the assailant, if that be necessary to avoid the apprehended danger, and the killing will be justifiable, although it may turn out afterwards that the appearances were false." The court refused this instruction, to which the defendant at the time saved his exceptions. The cause was submitted to the jury and taken under consideration. On the third day of the trial the jury had not reached a verdict, and the court, on its own motion and over the objection of appellant a few minutes after it convened, gave to the jury an additional instruction

designated No. 1. This is a long instruction, and the view we have reached concerning it makes it unnecessary to set it out.

The bill of exceptions recites the following: "After the court had twice instructed the jury, and while the court was in session, not trying another case, but waiting for the verdict, and while the jury was in the jury room deliberating, the Rev. A. J. Ashburn, foreman of the jury, left the jury room and went out into the hall and sent word to the court by the deputy sheriff that the foreman of the jury wanted to see the court. The court immediately went out into the hall where the foreman was, not knowing what he wanted, and answered the foreman's question, telling him that the jury could give less than one year for the lowest degree of homicide, according to the instructions twice given to the jury. Counsel for defendant was standing within about thirty feet of the court and the foreman of the jury, and could see them, but could not hear what was said. The foreman returned to the jury room, and the court immediately walked to where counsel for defendant was standing and told him what had been said. Counsel replied, "All right," but that he wanted to save his formal exceptions of record, to which the court consented. The court did not tell counsel for defendant that he was going to answer the foreman's question, and the first that counsel knew of the occurrence was when he saw the court standing in the hall, not in the court room, talking to the foreman of the jury. Counsel could not have anticipated anything of the kind, and had no opportunity to object before the occurrence took place, and he had no opportunity to request that the answer to the foreman be put in writing before it was given. When the verdict was returned into court, and before it was received, the court told all the jury the foregoing, and inquired if this was their understanding of what happened, and they said that it was. The court then asked them if the conduct of the judge and the foreman had exerted any influence what-

ever on them in reaching their verdict, to which they answered that it had not."

The jury returned a verdict finding Aydelotte guilty of involuntary manslaughter and left his punishment to be fixed by the court. The court entered a judgment sentencing Aydelotte to ten months' imprisonment in the State Penitentiary, from which is this appeal.

1. The court did not err in refusing appellant's prayer for instruction No. 7. All the law bearing upon the subject-matter of this instruction was fully covered and more accurately stated in instructions given by the court on its own motion. The court very fully and correctly declared the law on the degrees of criminal homicide and on self-defense in its instructions. We deem it unnecessary to incumber the record by setting forth these instructions. They are in conformity with the law as announced by this court in many cases. Appellant's prayer for instruction No. 7 is not an accurate and complete statement of the law in regard to the rights of a defendant under his plea of self-defense to act upon appearances of danger. The instruction is more or less argumentative in form and its peculiar phraseology cannot be approved as a precedent.

2. The first part of the court's instruction No. 1 given on the court's own motion after the jury had been considering the cause is entirely cautionary and does not invade the province of the jury. This portion of the instruction comes well within the bounds of the court's province to give the jury cautionary instructions where such instructions are not so framed as to express the court's views or conclusions on the facts of the case, and are so worded as not to intimate to the jury any opinion of the court as to the verdict that should be rendered by them.

The succeeding portions of this instruction No. 1 are merely explanatory of instructions already given by the court, and are couched in language so carefully guarded and selected by the trial court as not to invade

the province of the jury by passing upon the issues of fact. The recalling of trial juries, after the case has been submitted to them for decision, for additional instructions by the trial court on its own motion, where such additional instructions are in effect but a repetition of instructions already given before the jury retired to consider of its verdict, is not a practice to be commended. Unless the trial judge, under such circumstances, proceeds with extreme caution and is exceedingly careful in. the language employed in thus instructing the jury, his conduct is likely to be interpreted by one or the other of the parties to the litigation as manifesting a bias, prejudice, or partiality in the cause and as an effort on his part to argue the case and to unduly influence the jury in its deliberations. The judge should scrupulously avoid any act calculated to impress the parties to the cause with the idea that he is not holding the scales of justice in equipoise and weighing their respective rights with a fair and impartial hand. Necessarily the presiding genius of the trial is vested with large discretion to determine when the ends of justice require the recall of trial juries on his own motion to repeat instructions, or to give additional instructions, and, unless there is a manifest abuse of such discretion, his ruling in this regard, when challenged, will not cause a reversal of the judgment. After the most careful scrutiny of the additional instruction No. 1 given by the trial court in this cause, we are convinced that it is not open to the criticism made by counsel to the effect that it was but the expression of an opinion on the part of the trial judge that the appellant was guilty. Although the instruction, as we have stated, was a repetition of the law that had been previously correctly announced by the court, it was couched in language which on its face was wholly free from any expression of opinion of the trial judge on the merits of the cause. Every presumption, to be sure, must be indulged in favor of the utmost impartiality of the trial court so far as the manner of the delivery of his charge to the jury is concerned, and there

is nothing in this record to justify the criticism of counsel that this additional charge of the court was delivered with such emphasis and tone of voice as to convey to the jury the impression that the court was of the opinion that the appellant was guilty of the crime of manslaughter, and that such instruction had the effect of turning the scales against him and caused the jury to return a verdict finding appellant guilty of manslaughter. Additional instruction No. 1 contained several different propositions of law, and it occurs to us they are all correct, but, if some were correct and others erroneous, still only a general objection to the instruction was urged by counsel at the trial. In *Darden* v. *State,* 73 Ark. 315, 84 S. W. 507, we said: "The objection extended to the whole instruction, consisting of four paragraphs, and, one or more of these being sufficient, it should not have been sustained." See also *Bruder* v. *State,* 110 Ark. 402, 161 S. W. 1067.

3. The most serious question in this case is whether or not the court erred in telling the foreman of the jury in the hall of the courthouse, apart from his fellows, in answer to a question propounded to the judge by the foreman, that the jury could give less than one year for the lowest degree of homicide according to the instruction twice given to the jury. If this were all the record showed, it would undoubtedly be reversible error because contrary to § 3192, C. & M. Digest, which provides: "After the jury retires for deliberation, if there is a disagreement between them as to any part of the evidence, or if they desire to be informed on a point of law, they must require the officer to conduct them into court. Upon their being brought into court the information required must be given in the presence of, or after notice to, the counsel of the parties." The provisions of the above statute are mandatory, and where the facts call for an application of its provisions, unless the rulings of the court comply with the statute, they will constitute prejudicial error. The design of the lawmakers in the

enactment of this statute was to protect defendants on trial as well as the State, after causes have been finally submitted to the jury for its deliberation and verdict, against any further steps being taken in the case in regard to the evidence or the law unless in open court and after notice to the counsel of the respective parties. While the records show that the communication between the foreman of the jury and the trial judge occurred in the hall of the courthouse, yet the record further shows that appellant's counsel was standing within thirty feet of the judge and the foreman of the jury at the time, and, immediately after the communication, the judge informed appellant's counsel of such communication. The counsel stated to the judge it was all right, but he wished to save his formal exceptions. Even this would not have been a compliance with the statute if nothing further had been done, but, after the jury had returned into court with its verdict, and before the court had received the same, the court informed the jury of the communication that the judge had with the foreman, and inquired of them if such was their understanding of what had happened, and asked them if the conduct of the judge and the foreman had exerted any influence on them in reaching their verdict, and they answered that it had not. Thus it appears that the communication between the judge and the foreman of the jury was repeated in the presence of the jury and counsel in the court room before the verdict was received and announced. Counsel for the respective parties were thus notified of what had taken place, and what was then taking place, in open court, and they were then given an opportunity to register any objection they had or might have had to the procedure, and they offered none. Counsel for appellant was immediately informed by the presiding judge of the communication between him and the foreman, and given an opportunity then to request that the jury be brought into open court and that the same information be there given the jury as had been given to its foreman, and counsel for appellant did not make such request.

It occurs to us that the error of the trial judge in communicating with the foreman of the jury in the hall of the courthouse was fully cured by repeating the communication in the presence of counsel and jury in open court before the jury's verdict was received and announced, when appellant's counsel were given an opportunity to then and there offer any objection they had to the communication. *Wawak & Vaught* v. *State*, 170 Ark. 329, 279 S. W. 997. The statute was complied with both in letter and spirit, and therefore no prejudicial error resulted.

There is no reversible error in the record, and the judgment must therefore be affirmed.