Judy Ann FLANAGAN *v.* STATE of Arkansas

CR 06-88 243 S.W.3d 866

Supreme Court of Arkansas
Opinion delivered November 30, 2006

[Rehearing denied January 11, 2007.]

*Teri Chambers*, Arkansas Public Defender Comm'n, for appellant.

*Mike Beebe*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.

JIM HANNAH, Chief Justice. A Craighead County jury convicted appellant Judy Flanagan of the capital murder of Dennis Coats, and she was sentenced to a term of life imprisonment without parole. On appeal, she argues that the circuit court erred by

refusing to suppress statements she made to law-enforcement officers; by refusing to allow her to call Beverly Coats, the victim's wife, as a witness; by allowing the jury to replay her recorded statements during deliberations, and by refusing to grant a mistrial based on cumulative error. As this is a criminal appeal in which a term of life imprisonment has been imposed, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We find no error and, accordingly, we affirm.

## I. Facts

On the morning of June 12, 2004, Flanagan and Beverly Coats went to the home of Officer Chris Kelems to report that Dennis Coats, Beverly's husband, was missing. Flanagan informed Kelems that she had last seen Dennis the previous evening as he got into a light-colored van with occupants unknown to her. Flanagan said that, at the time, Dennis had been giving her a ride home in his truck, and when he got into the van, he asked Flanagan to drive his truck back home to his "old lady." At 11:06 the same morning, Officer Johnny Williams received a dispatch and responded to Hatchie Coon Island, otherwise known as the sunken lands, in reference to a report of a body found. Upon his arrival, Williams observed Flanagan and Christy Wood at the crime scene standing near Wood's green van. Williams told Flanagan and Wood to get into Wood's van and proceed behind him to a different area. Williams then instructed Game and Fish Officer Butch Wilkins to "keep an eye on them and not let them go anywhere."

Officer John Varner arrived at the scene at 12:08 p.m. Shortly after his arrival, he spoke to Flanagan and asked her to accompany him to the Caraway Police Department. Once at the police station, Varner and Sheriff Jack McCann conducted a taped interview, in which Flanagan described the events of the previous evening. Flanagan was not advised of her *Miranda* rights prior to making the statement. Later that day, Flanagan gave another statement and, again, she was not *Mirandized*.

On August 24, Dale Roach, Flanagan's brother, made contact with Officer Justin Rolland to advise that Flanagan wanted to speak with him. Rolland and Officer Dwaine Malone traveled to the home of Flanagan's parents in Poinsett County. Flanagan and Rolland sat in Rolland's vehicle and spoke for a period of time, during which Flanagan stated that she was starting to remember things about the homicide. According to Rolland, Flanagan wanted to go elsewhere to talk, and she chose Lake City among the several options he gave her. At Lake City, Rolland took an audio

tape-recorded statement from Flanagan at 12:15 a.m. on August 25. Flanagan was advised of her *Miranda* rights at the beginning of the tape. In that statement, Flanagan said that Beverly Coats killed Dennis, and Flanagan claimed that she "raked" a knife across Dennis's neck, at Beverly's direction, after he was dead. After this statement, Rolland arrested Flanagan for Dennis Coats's murder, and she was transported to the jail in Jonesboro by Sheriff McCann and Officer Malone.

At approximately 8:30-9:00 a.m. on August 25, in a video-taped statement, Flanagan admitted that she alone stabbed Dennis and then Beverly helped her move the body out of Dennis's truck. Flanagan was charged with capital murder on October 4, 2004.

## II. *Motion to Suppress*

Prior to trial, Flanagan filed a motion to suppress the statements she had made to police. The following statements are at issue:

1. Flanagan's spontaneous and voluntary remarks to Officer Wilkins at the scene where the body was found on June 12, 2004 (not specifically discussed on appeal);

2. Her audio tape-recorded statement to Sheriff McCann and Officer Varner, June 12, 2004, at 1:15 p.m.;

3. Her statement to Officers Varner and Thomas, June 12, 2004, at 8:00 p.m.;

4. Her statement to Officers Elliot and Thomas during her polygraph test on June 14, 2004 (not specifically discussed on appeal);

5. Her statement to Officer Varner immediately after her polygraph test (not specifically discussed on appeal);

6. Her statement to Officer Rolland, August 24, 2004, at her residence;

7. Her audio tape-recorded statement to Officer Rolland, August 25, 2004, 12:15 a.m., at Lake City;

8. Her spontaneous and voluntary statement to Sheriff McCann, August 25, 2004, during transport, that she did not murder

Dennis Coats and that he was already dead when she cut his throat (not specifically discussed on appeal);

9. Her videotaped statement to Officer Rolland, August 25, 2004, at the Craighead County jail; and

10. Statements she made over the telephone in the presence of Officer Metcalf, September 10, 2004 (not specifically discussed on appeal).[1]

## A. June 12 Statements

### 1. Unreasonable Seizure

Flanagan begins by arguing that all statements made at the police station on June 12, 2004, and all statements made subsequently, should be suppressed because she was unlawfully seized and unreasonably detained in violation of the Fourth Amendment and Ark. R. Crim. P. 2.1, 2.2, 2.3, 3.1, and 3.5. Flanagan states she was unreasonably seized when Officer Williams asked her to remain at the crime scene. Further, Flanagan states that, even if she was not immediately seized by Officer Williams, she was certainly seized by Officer Wilkins of the Game and Fish Commission when he denied her request to leave. Wilkins, who had been on the scene directing traffic, testified that Flanagan asked him if she could leave to go tell Beverly Coats that they had found her husband's body. He stated that he told her she could not leave because she was at the scene when the officers first arrived and she would need to stay to talk to investigators. Flanagan contends that she was seized because a reasonable person would not believe she was free to leave. In *United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980), the Supreme Court stated:

> We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with

---

[1] Those statements not specifically discussed on appeal are subject only to Flanagan's "fruit of the poisonous tree" argument.

the privacy and personal security of individuals." *United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 96 S. Ct. 3074, 3081 (1976). As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

. . . .

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

■ We first note that we agree with the State's contention that Flanagan was not seized or unreasonably detained simply because officers who initially arrived and found her and Christy Wood on the scene asked them to move the van back from the crime scene and stay and talk to investigators. Officer Williams, the first to arrive at the scene, testified that he asked Flanagan to stay, and that she agreed. However, when Flanagan asked Wilkins if she could leave and was told that she could not, it was reasonable for her to believe that she was not free to go. At that point, Flanagan was "seized" within the meaning of the Fourth Amendment. Still, while we agree that Flanagan was seized when she was told she could not leave, we do not believe that the seizure was unreasonable such that it requires suppression of her statements. The circuit court found that "[i]n light of the remoteness of the crime scene and the circumstances existing at the time, requesting the defendant to remain at the crime scene was reasonable." Further, Flanagan's statements at the crime scene were not incriminating. According to Wilkins, Flanagan said that she had last seen the victim the night before when he got into a van with some other people to go and drink beer.

■ Next, Flanagan turns to statements she made after officers requested that she go to the police station. She states that the fact that she complied at the time when Officer Varner requested that she go to the police station does not render these encounters voluntary. Further, she argues that Varner had a duty to make clear that she was not obligated to go to the police station. Pursuant to Rule 2.3 of the Arkansas Rules of Criminal Procedure:

If a law enforcement officer acting pursuant to this rule requests any person to come to or remain at the police station . . . he shall take

> such steps as are reasonable to make clear that there is no legal obligation to comply with such a request.

The rule "does not require an explicit statement that one is not required to accompany the police; rather, the police only need to take such steps as are 'reasonable to make clear that there is no legal obligation to comply' with the request to come to the police station." *Shields v. State*, 348 Ark. 7, 14, 70 S.W.3d 392, 395 (2002). The circuit court found that there was no indication that upon Flanagan's refusal of Varner's request, compliance would be compelled. Officer Varner testified that Flanagan was very cooperative and never hesitated when asked to accompany the officers to the police station. He said that Flanagan was not handcuffed and that he did not demand that she go with him. Varner stated that at the station, the officers asked her what she had seen, and that at no point during the conversation did she say that she wanted to leave or "act like she was tired of the questions or things of that nature." Under the totality of the circumstances, there was no unreasonable seizure or detention that justifies suppression of Flanagan's statements at the station. Thus, it follows that we disagree with Flanagan's argument that all subsequent statements should have also been suppressed as fruits of the poisonous tree, pursuant to *Wong Sun v. United States*, 371 U.S. 471 (1963).

## 2. Miranda *Warnings*

Flanagan also argues that the suppression of the June 12 statements is warranted because she was not *Mirandized* prior to making the statements. The State contends that Flanagan was not in custody when she made the statements on June 12; therefore, the *Miranda* warnings were not necessary. In *Hall v. State*, 361 Ark. 379, 206 S.W.3d 830 (2005), we stated:

> This court has held that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest. The *Miranda* warnings are not required simply because the questioned person is one whom the police suspect. A person is "in custody" for purposes of the *Miranda* warnings when he or she is "deprived of his freedom by formal request or restraint on freedom of movement of the degree associated with a formal arrest." In resolving the question of whether a suspect was in custody at a particular time, the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation. The initial determination of custody depends on the objective circumstances of the interroga-

tion, not on the subjective views harbored by either the interrogating officers or the person being interrogated.

*Hall*, 361 Ark. at 389, 206 S.W.3d at 837 (internal citations omitted).

■ Here, while Flanagan may have been a suspect at the time she made the statements, she was not "deprived of her freedom by formal request or restraint on freedom of movement of the degree associated with formal arrest." As previously noted, Flanagan was asked, not ordered, to go the police station, she was not handcuffed, and she was described as being very cooperative. Flanagan was not "in custody" at this time; therefore, the *Miranda* warnings were not required. We hold that the circuit court did not err in denying Flanagan's motion to suppress her June 12 statements.

### B. *August 25 Statements*

#### 1. *Voluntariness of Waiver*

Flanagan next argues that the statements she made on August 25, 2004, should have been suppressed because, under the totality of the circumstances, she did not knowingly, voluntarily, and intelligently waive her right against self-incrimination. Flanagan made these statements after she was given her *Miranda* warnings. A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *MacKool v. State*, 365 Ark. 416, 231 S.W.3d 676 (2006). In order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, this court looks to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.* To make this determination, we review the totality of the circumstances surrounding the waiver including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Id.* We will reverse a trial court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Id.*

In support of her argument that she did not voluntarily waive her rights, Flanagan points to testimony before the circuit court that showed her IQ was only 85, that she had a history of

mental illness, and the fact that she was on three different types of prescription medication for her mental illness. She also points to her brother's testimony that just hours before her 12:15 a.m. statement, she was "acting crazy" and "took a bunch of pills" in an apparent attempt to overdose. Flanagan's brother also said that near that time, she "had died" and he "brought her back to life." Flanagan further points to her mother's testimony that, prior to making her statement, Flanagan was "acting like she was in a daze." Finally, Flanagan contends that the State presented no evidence to suggest that Flanagan had ever had any involvement in the criminal justice system or with waiving or invoking her constitutional rights.

The State contends that Flanagan's voluntary waiver of her rights is demonstrated by the fact that Flanagan herself initiated the statements by contacting Officer Rolland late on August 24, 2004, and speaking with him at her home about the murder to "get [some things] off her chest to clear her conscience." According to Rolland, Flanagan asked to go to the Lake City sheriff's office to make her statement because she was uncomfortable talking with him in her home or her car. Rolland testified that Flanagan did not appear to be under the influence of any intoxicants at the time she spoke with him.

The circuit court concluded that Flanagan voluntarily accompanied Rolland to the sheriff's office and noted that Flanagan was given her *Miranda* warnings prior to her 12:15 statement. The circuit court listened to the audiotape of Flanagan's statement and found that "[d]uring the audio-recorded statement defendant is lucid and responds appropriate[ly] to questions relating details that are consistent with facts known to law enforcement officers. There is no evidence that defendant is under the influence of drugs or alcohol."

The evaluation of the credibility of witnesses who testify at a suppression hearing about the circumstances surrounding an appellant's custodial confession is for the trial judge to determine, and this court defers to the position of the trial judge in matters of credibility. *MacKool, supra.* Conflicts in the testimony are for the trial judge to resolve, and the judge is not required to believe the testimony of any witness, especially that of the accused, since he or she is the person most interested in the outcome of the proceedings. *Id.* So long as there is no evidence of coercion, a statement made voluntarily may be admissible against the accused. *Id.*

■ ■ In this case, while there was testimony from Flanagan's family members that she was impaired at the time she made statements to police, Rolland testified that Flanagan did not appear to be intoxicated when she spoke to him. It is clear that the judge found Rolland's testimony to be more credible than the testimony of Flanagan's brother and mother. In addition, the trial judge himself listened to the tape of the interview, and so was able to hear for himself whether or not Flanagan sounded as if she were impaired. *See Jones v. State*, 344 Ark. 682, 42 S.W.3d 536 (2001). Under the totality of the circumstances, the circuit court did not err in finding that Flanagan knowingly, voluntarily, and intelligently waived her rights prior to making a statement to police on August 25, 2004, at 12:15 a.m.

## 2. False Promise of Reward

The next statement at issue on appeal is Flanagan's "8:30 or 9:00 a.m." statement made to Rolland at the Craighead County jail. Flanagan argues that this statement should be suppressed because she was "apparently unable to take medications" prior to making the statement, she was depressed to the extent that Rolland felt she should be placed on suicide watch, and most importantly, because her confession was obtained through a false promise of reward or leniency. In *Williams v. State*, 363 Ark. 395, 214 S.W.3d 829 (2005), we stated:

> We note at the outset that a statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). In order to determine whether a waiver of *Miranda* rights is voluntary, we look to see if the confession was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.* When we review a trial court's ruling on the voluntariness of a confession, we make an independent determination based on the totality of the circumstances. *Id.*
>
> A statement induced by a false promise of reward or leniency is not a voluntary statement. *Roberts v. State*, 352 Ark. 489, 102 S.W.3d 482 (2003). When a police officer makes a false promise that misleads a prisoner, and the prisoner gives a confession because of that false promise, then the confession has not been made voluntarily, knowingly, and intelligently. *Id.* For the statement to be

involuntary, the promise must have induced or influenced the confession. *Id.*; *Bisbee v. State*, 341 Ark. 508, 17 S.W.3d 477 (2000), *overruled on other grounds in Grillot*, 353 Ark. 294, 107 S.W.3d 136. Furthermore, the defendant must show that the confession was untrue, because the object of the rule is not to exclude a confession of truth, but to avoid the possibility of a confession of guilt from one who is, in fact, innocent. *Id.* In determining whether there has been a misleading promise of reward or leniency, this court views the totality of the circumstances and examines, first, the officer's statement and, second, the vulnerability of the defendant. *Id.*

*Williams*, 363 Ark. at 404–05, 214 S.W.3d at 834–35.

Flanagan claims that she confessed to Rolland because he promised her that she would be allowed to speak to her mother and her psychiatrist if she confessed. Rolland contradicted this testimony, stating that he told Flanagan he would interview her first, and then he would see about helping her speak to her mother and her psychiatrist.

The circuit court viewed the videotaped statement and found that Flanagan was lucid and responded appropriately to questions. Further, the court found that there was no evidence that Flanagan was under the influence of drugs or alcohol or that she was "detached from reality." The court determined that there was no evidence to suggest that Flanagan was more susceptible to undue influence or less able to resist pressure due to side effects of prescription drugs, lack of prior involvement with the law, or any alleged defect in mental state, education, or IQ. Finally, the court concluded that the statements of Rolland to Flanagan regarding calling Flanagan's mother or arranging treatment for Flanagan at MidSouth Health Services were not tied to Flanagan's waiver of her rights and were, thus, inconsequential.

■ Here, the circuit judge viewed the videotaped statement; thus, he was able to hear for himself whether or not Flanagan sounded as if she were impaired and whether Rolland obtained a confession through a false promise of reward. The record does not indicate that Flanagan was mentally impaired such that she did not realize the meaning of her statement. Nor does the record indicate, as Flanagan suggests, that Rolland offered desired benefits to obtain her participation in and completion of the interview. The circuit court's finding is not clearly against the preponderance of the evidence.

### 3. Delay in Miranda Warnings

Flanagan argues that the waiver of her rights was involuntary due to the delay between her *Miranda* warnings and the statement she made around 8:30 a.m. on August 25. The record shows that Flanagan was *Mirandized* prior to making her 12:15 a.m. statement on August 25. Further, the circuit court found that, prior to making her 8:30 a.m. statement, Flanagan acknowledged that Rolland had read her rights to her earlier, and that she remembered those rights. In *Williams, supra*, we noted:

> This court has held that there is no constitutional requirement that a suspect be warned of his *Miranda* rights each time he is questioned. *See Howell v. State*, 350 Ark. 552, 89 S.W.3d 343 (2002), *overruled on other grounds in Grillot*, 353 Ark. 294, 107 S.W.3d 136; *Bryant v. State*, 314 Ark. 130, 862 S.W.2d 215 (1993). There is likewise no mechanical formula for measuring the longest permissible interval between the last warning and the confession. *See Barnes v. State*, 281 Ark. 489, 665 S.W.2d 263 (1984); *Upton v. State*, 257 Ark. 424, 516 S.W.2d 904 (1974).[2] *Miranda* warnings need only be repeated when the circumstances have changed so seriously that the accused's answers are no longer voluntary, or the accused is no longer making a knowing and intelligent relinquishment or abandonment of his rights. *See Conner v. State*, 334 Ark. 457, 982 S.W.2d 655 (1998) (citing *Wyrick v. Fields*, 459 U.S. 42 (1982)).

*Williams*, 363 Ark. at 408-09, 214 S.W.3d at 857.

The circuit court determined that the passage of eight hours was not so great nor Flanagan's circumstances so changed, that new *Miranda* warnings were required. Thus, the circuit court concluded that in light of all the circumstances, the *Miranda* warnings given to Flanagan prior to her earlier statement were sufficient to uphold the 8:30 a.m. statement. We agree. Viewing the totality of the circumstances, we conclude that the interval of time between the last warning and the giving of the statement did not render Flanagan's confession involuntary.

---

[2] Indeed, this court has refused to set a bright-line rule about the passage of time from the last *Miranda* warning; instead, we determine the voluntariness of the confession in light of the totality of the circumstances. *See, e.g., Williams, supra* (twenty-two hour lapse); *Barnes v. State*, 281 Ark. 489, 665 S.W.2d 263 (1984) (three-day lapse); *Upton v. State*, 257 Ark. 424, 516 S.W.2d 904 (1974) (two-day lapse).

### 4. Request for Counsel

Finally, Flanagan argues that the circuit court's refusal to suppress the 8:30 a.m. videotaped statement was clearly against the preponderance of the evidence because (1) Rolland continued to question her after she had inquired of her right to counsel, and (2) his response to her inquiry linked appointment of counsel to a future court appearance rather than making clear that Flanagan could have counsel appointed prior to further questioning. Following is the relevant portion of the transcript of the interview:

> Q: Judy, in this interview, before we conduct this interview, I am going to, of course, you have had your rights read to you already. Is that correct?
>
> A: Yes.
>
> Q: OK. I am going to do it again. You understand what your rights are, first of all? Right. You know what I am talking about? I explained this earlier, is that correct?
>
> A: Yes.
>
> Q: All I want you to do is give me a yes or no response. Do you understand that you have a right to remain silent? Do you understand that?
>
> A: Could I ask you something?
>
> Q: Sure.
>
> A: On all those rights, part of me understands it but then a part of me doesn't.
>
> Q: Well, you know, before we talked, when I and that's why I am advising you of your rights. You know, basically, that means, that, well I'll just read them to you again.
>
> A: Well, I remember what you said they were last night.
>
> Q: You remember what they are, right?
>
> A: Yes.

Q: OK. What, what part did you not understand?

A: Do I need to call an attorney?

Q: Well, you can have an attorney present.

A: I don't know one. I don't have money to buy.

Q: Well, you can have one. What you will do, is when we go to court, you know, if you can't afford one, they will appoint you one. That's what I explained to you earlier this morning. Do you remember that?

A: Yes.

Q: OK. Alright.

A: OK.

The circuit court made the following findings with respect to Flanagan's argument that she requested counsel:

Defendant was advised of her *Miranda* rights at 12:15 a.m. on August 25, 2004, and at that time executed a Your Rights and Waiver of Rights form. Some eight hours later, while incarcerated at the Craighead County jail, prior to a second round of questioning by Rolland, defendant acknowledge[d] that Rolland had read defendant's rights to her earlier. Defendant acknowledged that she remembered the rights Rolland had explained to her in the early morning hours of August 25, 2004. Rolland again reminded defendant that she had the right to remain silent, the right to have an attorney present, and the right to have an attorney appointed by the court if she could not afford an attorney. In response to a question from Rolland, Defendant acknowledged that she remembered those rights as explained to her earlier by Rolland. Defendant's question of Rolland, "Do I need to call an attorney?" was not a request by defendant to stop the questioning or a request by defendant of a lawyer. Defendant subsequently gave an inculpatory statement. The Arkansas Supreme Court has upheld the permissible time between *Miranda* warnings and a statement from a few hours to three days. The passage of eight hours is not so great nor Flanagan's circumstances so changed, that new *Miranda* warnings are required. In light of all circumstances the *Miranda* warnings given to defen-

dant at 12:30 a.m. were sufficient to uphold the 8:30-9:00 a.m. video statement of defendant without new *Miranda* warnings.

The State contends that Flanagan's argument that the interviewer did not honor her request for an attorney fails because her request was equivocal. We agree.

We have held that after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney. *Higgins v. State*, 317 Ark. 555, 879 S.W.2d 424 (1994). An ambiguous reference to an attorney by a suspect after hearing his *Miranda* rights does not require that the interrogation cease. *Id.* In *Higgins*, this court held that the question, "Do you think I need an attorney?" was not an unequivocal request for counsel and, thus, did not require that the interrogation cease. Flanagan claims that *Higgins* is distinguishable from the instant case because the requirement for clear or unequivocal request for counsel comes into play only after a knowing and voluntary waiver of the right has previously been made. She argues that in her case, the waiver was not knowingly and voluntarily made, and, further, that *Higgins* did not involve earlier requests made by the appellant to officers which had been denied, or suggestions by law enforcement that the appellant would obtain desired benefits or rewards after the interview was concluded. We see no such distinction. Flanagan's attempt to distinguish her case fails because we have already determined that the circuit court did not err in concluding that Flanagan's waiver was voluntary and that her confession was not obtained by the promise of reward.

■ Here, after being given her *Miranda* warnings, Flanagan asked, "Do I need to call an attorney?" This is analogous to the facts in *Higgins* where, after being given his *Miranda* warnings, Higgins asked, "Do you think I need an attorney?" Like the appellant's reference in *Higgins*, Flanagan's "reference to an attorney in this case was surely ambiguous and hardly amounted to the sort of direct request required to invoke [her] Fifth Amendment right to counsel." *Higgins*, 317 Ark. at 563, 879 S.W.2d at 428. As such, we affirm the circuit court on this point. Based on the foregoing, we cannot say that the circuit court abused its discretion in denying Flanagan's motion to suppress.

### III. Calling Beverly Coats as a Witness

■ Flanagan argues that the circuit court erred in refusing to allow her to call Beverly Coats as a witness, thus violating her

compulsory process and due process rights, including the right to present a defense and the right to a fair trial. Prior to trial, Flanagan made an oral motion that the case against Beverly Coats be disposed of prior to Flanagan's trial so that Beverly could be called as a witness for Flanagan. The circuit court denied Flanagan's motion, stating: "I'm not directing that the prosecutors try Mrs. Coats's case first or set it for priority over the Flanagan case." Flanagan planned to call Beverly as a witness; however, Beverly's attorney informed the court that Beverly would exercise her right to remain silent throughout the course of the trial. Flanagan argued that there could not be a "blanket Fifth," and citing Ark. R. Evid. 510, she contended that Beverly had partially waived the privilege by making statements to the police. Rule 510 provides: "A person upon whom these rules confer a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged." The State contends that, contrary to the appellant's assertion, Ark. R. Evid. 510, by its terms, does not apply to the Fifth Amendment privilege against self-incrimination that Beverly was going to invoke. We agree. Rule 501(1) of the Arkansas Rules of Evidence provides, "*Except as otherwise provided by constitution* or statute or by these or other rules promulgated by the Supreme Court of this State, no person has a privilege to refuse to be a witness." (Emphasis added.) This includes the Fifth Amendment, as it is a privilege "otherwise provided by constitution." *Echols v. State*, 326 Ark. 917, 964, 936 S.W.2d 509, 533 (1996), *cert. denied*, 520 U.S. 1244 (1997). "[N]either the prosecution nor the defense is permitted to call a witness knowing that the witness will claim his testimonial privilege." *Hamm v. State*, 301 Ark. 154, 159, 782 S.W.2d 577, 580 (1990).

■ Next, Flanagan argues that the circuit court erred in refusing to compel the State to grant Beverly the use of immunity under Ark. Code Ann. § 16-43-603 so that she could testify. We disagree. In *Williams v. State*, 329 Ark. 8, 19, 946 S.W.2d 678, 684 (1997), we stated:

> This court has said that the granting of immunity is not a constitutional right but merely one authorized by statute. *Fears v. State*, 262 Ark. 355, 556 S.W.2d 659 (1977). It is within the prosecutor's

discretion to grant immunity when it is in the public's interest. *Id.* The reason for granting immunity is to aid in the prosecution of criminals by inducing witnesses to testify. *Id.*

Williams fails to cite any criminal case law or statute in support of his argument that his constitutional rights were infringed, and this failure to adduce apposite authority or otherwise to make a convincing argument is sufficient reason to affirm the trial court's ruling on this point. *Hall v. State*, 326 Ark. 318, 933 S.W.2d 363 (1996); *Dixon v. State*, 260 Ark. 857, 545 S.W.2d 606 (1977).

Pursuant to our holding in *Williams*, it is clear that the granting of immunity is *within the prosecutor's discretion*; therefore, Flanagan's argument fails. Further, like the appellant in Williams, Flanagan fails to make a convincing argument that her constitutional rights were infringed. Accordingly, we affirm the circuit court on this point.

## IV. Jury's Replaying of Recorded Statements Outside the Courtroom

Flanagan argues that the circuit court erred in allowing the deliberating jury to replay her recorded statements outside the courtroom. During its deliberations, the jury notified the court that it wanted access to a tape recorder, and this request prompted a discussion between the court and counsel about the issue of a TV/VCR already being in the jury room. Flanagan objected to allowing the tape recorder or the TV/VCR to be utilized by the jury for the purpose of having the audio and video-taped statements replayed to the jury outside of the courtroom and outside of her presence. The circuit court rejected the argument, finding that the tapes had been introduced into evidence. Shortly thereafter, a discussion was held concerning the belief that the jury was then watching the video tape in the jury room.

Flanagan argues that the replaying of these recorded statements could only be appropriately done in open court, because it was a substantial step in the proceedings and she had a right to be present pursuant to Ark. Code Ann. § 16-89-125(e) and *Davlin v. State*, 313 Ark. 218, 853 S.W.2d 882 (1993). The State contends that since the jury did not ask to be informed on a point of law, and there was no interaction between the trial judge and the jury during deliberations, § 16-89-125(e) is inapplicable. Rather, the State argues that § 16-89-125(d)(3) is the applicable statute. The State, citing *Goff v. State*, 341 Ark. 567, 19 S.W.3d 579 (2000), contends that the tapes in question were items of physical evi-

dence, and the jury had a right to review them during deliberations outside the presence of the judge, counsel, and the appellant.

We recently addressed this issue in *Anderson v. State*, 367 Ark. 536, 242 S.W.3d 229 (2006), where the appellant argued that the circuit court erred in sending his recorded statement to the deliberating jury. In that case, the jury requested a document that had already been admitted into evidence. Consistent with the circuit court's practice, all exhibits, including an audiotape of appellant's statement and a tape player, were sent into the jury. We stated:

> What is at issue is a taped statement that was played at trial and admitted into evidence. It was one of the exhibits sent to the jury when it requested the Eason document. What the jury asked for was a paper exhibit. Under section 16-89-125(d)(3), the Eason document, being a paper document, was certainly properly made available to the jury by the circuit court. The tape was not a paper document. Although the statute uses the term "papers," the cases interpreting section 16-89-125(d)(3) do not limit exhibits that may be given to the jury during deliberations to papers. In *Goff v. State*, 341 Ark. 567, 19 S.W.3d 579 (2000), we held that it was within the circuit court's discretion under Ark. Code Ann. § 16-89-125(d)(3), to allow all exhibits, including a hammer, to be given to the jury during deliberations. Arkansas Code Annotated Section 16-89-125(d)(3) does not prohibit the jury from receiving and considering all exhibits, including the tape of Anderson's statement during deliberations.

> However, Anderson argues that allowing the jury access to the tape during deliberations was a violation of Ark. Code Ann. § 16-89-125(e). This was enacted as Section 248 of the Criminal Code of 1869 and is identical to Ark. Code Ann. § 16-89-125(e), which provides:

> > After the jury retires for deliberation, if there is a disagreement between them as to any part of the evidence or if they have a desire to be informed on a point of law, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of or after notice to the counsel of the parties.

> Anderson alleges that under the analysis in *Davlin v. State*, 313 Ark. 218, 853 S.W.2d 882 (1993), Ark. Code Ann. § 16-89-125(e)

prohibits sending the tape into the jury deliberations. In *Davlin*, the jury asked during deliberations to view the videotaped statement of the victim.

The facts of *Davlin* distinguish it from the present case. In discussing the statute now codified as Ark. Code Ann. § 16-89-125(e), this court said:

> The design of the lawmakers in the enactment of this statute was to protect defendants on trial as well as the State, after causes have been finally submitted to the jury for its deliberation and verdict, against any further steps being taken in the case in regard to the evidence or the law unless in open court and after notice to the counsel of the respective parties.

*Aydelotte v. State*, 177 Ark. 595, 603-04, 281 S.W. 369, 372 (1926); *see also Golf v. State*, 261 Ark. 885, 552 S.W.2d 236 (1977); *Boone v. State*, 230 Ark. 821, 327 S.W.2d 87 (1959). The court has more recently stated that the purpose of Ark. Code Ann. § 16-89-125(e) is to protect against misinformation communicated to the jury. *Sanders v. State*, 317 Ark. 328, 878 S.W.2d 391 (1994). Thus, the purpose of section 16-89-125(e) is to protect against any further steps being taken with respect to evidence unless done in open court with counsel present. No further step was taken with respect to the evidence against Anderson in this case.

The jury was given the tape they had already heard to replay if they chose to do so. In *Davlin*, the videotape had portions that were not played at trial:

> The record states that the videotape would be replayed in the jury room just as it was at trial, with certain prejudicial portions deleted. However, the record is silent with respect to what actually occurred in the jury room and therefore does not assure us there was a lack of prejudice in the replaying of the tape.

*Davlin*, 313 Ark. at 221, 853 S.W.2d at 884. Thus, while the proposal was to replay the tape just as it had been played at trial, the record did not show that it was so replayed. In other words, if excluded portions of the videotape were played to the jury, a further step was taken in respect to the evidence in violation of the statute. Strict compliance with Ark. Code Ann. § 16-89-125(e) is required. *McKinney v. State*, 303 Ark. 257, 797 S.W.2d 415

(1990); *Rollie v. State*, 236 Ark. 853, 370 S.W.2d 188 (1963). Where there is a violation, prejudice is presumed, and it is up to the State to disprove that prejudice. *Goff v. State*, 329 Ark. 513, 953 S.W.2d 38 (1997); *Williams v. State*, 264 Ark. 77, 568 S.W.2d 30 (1978). Where it cannot be shown what happened, prejudice is presumed. *Tarry v. State*, 289 Ark. 193, 710 S.W.2d 202 (1986).

In *Davlin*, giving the requested videotape to the jury created the possibility that evidence that was never introduced at trial might be introduced in the jury room. In that case, prejudice had to be presumed because it was impossible to glean from the record whether the prejudicial portions of the tape were deleted as they had been at trial. In the present case, there was no such danger. We hold that there was no violation of Ark. Code Ann. § 16-89-125(e) in this case because the jury received an admitted exhibit where there was no danger of additional evidence being introduced by giving the exhibit to the jury during deliberations.

*Anderson*, 367 Ark. at 539-41, 242 S.W.3d at 232-33 (footnotes omitted).

The instant case is analogous to the *Anderson* case. Thus, we agree with the State's contention that the tapes in question, having already been admitted into evidence, were properly made available to the jury by the circuit court, pursuant to § 16-89-125(d)(3). Further, the instant case is distinguishable from the *Davlin* case, because in this case, giving the tapes in question to the jury did not create the possibility that evidence that was never introduced at trial might be introduced in the jury room. Here, we are not required to presume prejudice because there is no contention that the tapes in question contained excluded, prejudicial evidence. We hold that there was no violation of Ark. Code Ann. § 16-89-125(e) in this case because the jury received admitted exhibits where there was no danger of additional evidence being introduced by giving the exhibits to the jury during deliberations. *See Anderson, supra.*

We also reject Flanagan's argument that the replaying of the recorded statements constituted a substantial step in the proceedings. In *Anderson, supra*, we explained:

It is a basic principle of both our state's and our nation's constitutional law that a criminal defendant has the right to be present in person and by counsel at any critical stage in his or her case. *Smith*

*v. State*, 343 Ark. 552, 39 S.W.3d 739 (2001); *Davlin, supra.* A criminal defendant has a Sixth Amendment right to an attorney at every critical stage of the proceedings. *Hammett v. Texas*, 448 U.S. 725 (1980). A criminal defendant has a due process right to be present at critical stages of the proceeding. *Kentucky v. Stincer*, 482 U.S. 730 (1987). The complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice because the adversary process itself has been rendered presumptively unreliable. *Roe v. Flores-Ortega*, 528 U.S. 470 (2000).

A critical stage in a criminal proceeding is every stage where substantial rights of the criminal defendant may be affected. *Rhay v. Washington*, 389 U.S. 128 (1967). "A critical stage in a criminal proceeding is characterized by an opportunity for the exercise of judicial discretion or when certain legal rights may be lost if not exercised at that stage." *Commonwealth v. Johnson*, 574 Pa. 5, 13, 828 A.2d 1009, 1014 (2003).

. . . .

Anderson objected to submitting the tapes to the jury during deliberations. He argued that it had to be done in open court with him present and represented by counsel. The circuit court refused and allowed the tapes to go to the jury along with all the exhibits admitted into evidence. If replaying the tapes had constituted the presentation of new evidence, Anderson's position would be correct because presentation of new evidence is a critical stage. *Perry v. Leeke*, 488 U.S. 272 (1989). However, there is nothing in the record to show that the jury would have been exposed to anything other than what was already played at trial. Anderson was present with counsel when the tapes were played at trial and had the opportunity to object and be heard at that time. He does not argue on appeal that the circuit court erred in denying his motion to exclude the tapes. There is nothing about replaying the tapes that would have been any more incriminating to Anderson than the incrimination that may have arisen from playing the tapes at trial. Nor was this a step in the proceedings that was critical to the outcome where his presence would have contributed to the fairness of the procedure. *Stincer, supra.* The jury was simply given exhibits already admitted into evidence. We hold that [the] jury's replaying during deliberations audiotapes of an out-of-court statement admitted into evidence and made an exhibit at trial is not a critical stage

in criminal proceedings. There was nothing in this case to indicate that Anderson would suffer any new prejudice by the jury's replaying the tapes.

*Anderson*, 367 Ark. at 542–43, 242 S.W.3d at 234–35.

██ Here, too, the jury was simply given exhibits already admitted into evidence. Accordingly, we hold that the jury's replaying during deliberations audiotapes and videotapes of out-of-court statements admitted into evidence and made exhibits at trial is not a critical stage of criminal proceedings.

### V. Cumulative Error

Flanagan argues that the circuit court erred in denying her motion for mistrial based on cumulative error. A mistrial is a drastic remedy and should only be declared when there is an error so prejudicial that justice cannot be served by continuing the trial, or when fundamental fairness of the trial itself has been manifestly affected. *Ferguson v. State*, 343 Ark. 159, 33 S.W.3d 115 (2000). In addition to the alleged errors already discussed in this opinion, Flanagan alleges several additional errors and argues that when all errors are considered, they amount to cumulative error requiring reversal.

### A. Admission of Flanagan's Statements

Flanagan argues that the admission of her statements into evidence was extremely prejudicial because without them, the only evidence tending to connect her to the crime would be that she was the last person seen alone with Dennis. It appears that Flanagan is attempting to reargue her first point on appeal: that the circuit court erred in denying her motion to suppress. Because we have already determined that the circuit court did not err in denying the motion, it is unnecessary for us to address this allegation of error.

### B. Beverly's Statements to Police and Letters to Mike Morris

Flanagan argues that the circuit court erred in prohibiting her from introducing Beverly's statements made to the police and Beverly's letters written to an acquaintance, Mike Morris. Flanagan does not explain why the statements and letters should have been admitted, nor does she explain how she was prejudiced by the circuit court's rulings denying admission. Because Flanagan fails to provide any argument on this issue, we do not address it. This

court does not research or develop arguments for appellants. *See, e.g., Hathcock v. State,* 357 Ark. 563, 182 S.W.3d 152 (2004).

C. *Testimony of Pat Humes, Jason Kelems, Danny Warren, and Michael Carmichael*

Flanagan states that, because the circuit court prevented her from calling Beverly as a witness, it was error for the circuit court to prohibit her from introducing relevant evidence about Beverly through other sources. The following testimony was proffered for the circuit court's consideration. Pat Humes said that she had known Beverly for twenty to twenty-five years, and that about six years earlier, Beverly had been upset with Dennis and stated that she hated "that M-F," that she was going to give him some Temik and "kill that M-F." According to Humes, Beverly said this like she meant it. Jason Kelems stated that, about two weeks before Dennis's death, Beverly told Kelems that, unbeknownst to Dennis, she occasionally gave Dennis Xanax in his food or tea to help him sleep. Danny Warren said that, possibly as long as a year before Dennis died, Beverly told Warren that after she gave Dennis some sleeping pills, he slept for about thirty-six hours. Michael Carmichael told the court that he saw Beverly put Xanax in Dennis's beer about four months prior to Dennis's death, and that he saw her put Xanax in her youngest daughter's drink in the days following Dennis's death.

The circuit court prohibited Flanagan from introducing any of the above evidence to the jury, finding no hearsay exceptions under Ark. R. Evid. 803(2), (3), or (24), 804(b)(3) or (b)(5), or admissibility under 404(b). With respect to Pat Humes, the circuit court found that she was credible, but the statement was too remote and that Dennis did not die of Temik poisoning. With respect to Jason Kelems, the circuit court found him reliable and credible; however, even though his testimony concerned a recent event, the court found that the Kelems statement, along with the Humes statement, would be more confusing than informative to the jury. The court found that the evidence from Danny Warren was remote in time and uncertain as to the date, and it noted that Michael Carmichael was "uncertain as to the date of the event, how remote in time it might be." Thus, the circuit court did not allow testimony from Humes, Kelems, Warren, and Carmichael. In evidentiary determinations, a trial court has wide discretion, and we do not reverse absent an abuse of that discretion. *Bullock v. State,* 353 Ark. 577, 111 S.W.3d 380 (2003). We cannot say the

circuit court abused its discretion in denying admission of the testimony of Humes, Kelems, Warren, and Carmichael.

### D. "Goodbye Earl" Tape

Flanagan argues that the circuit court erred in prohibiting her from presenting evidence to the jury that a cassette tape of the song "Goodbye Earl" by the Dixie Chicks was found during a search of Beverly's truck. The tape was lost prior to trial, so Flanagan proffered a CD of the song, the lyrics, and a newspaper article in which the sheriff spoke of the similarity between the crime at issue and the manner of Earl's demise in the song. Flanagan states that the evidence that Beverly had a cassette tape with this single song on it provides a basis to rationally infer that Beverly had been listening to the tape and plotting Dennis's murder. Specifically, Flanagan states, the song tells of two females who kill Earl and wrap him in a tarp, which is very similar to the facts of the case at bar. Flanagan also states that the song implies that Earl's black-eyed peas were poisoned, which is consistent with both Beverly's history of drugging her husband without his knowledge and Beverly's revelation to Pat Humes that she had planned to poison Dennis. The circuit court found no relevance and denied admission of the evidence. Whether evidence is relevant is a matter addressed to the sound discretion of the circuit court. *See, e.g., Evans v. State*, 317 Ark. 532, 878 S.W.2d 750 (1994). We cannot say that the circuit court abused its discretion. Further, while Flanagan was not allowed to introduce the written lyrics into evidence or play the song for the jury, there was testimony that the recording was found in Beverly's truck.

### E. Exculpatory Information

Flanagan states that, although the circuit court granted her pretrial motion requesting discovery of police officers' rough notes, mitigating and exculpatory evidence, and investigative reports, and ordered all officers to turn over all notes and evidence to the prosecutor by August 3, 2005, Officer Malone failed to turn over his notes until the evening of August 10, after the third full day of testimony at trial. Flanagan states that Malone's notes showed that Theresa Schultz was a good friend of Beverly Coats and might be able to provide relevant information. Flanagan states that the circuit court's failure to, at the very least, grant a continuance to allow counsel to explore any information held by Theresa Schultz was a violation of due process.

If the prosecutor fails to comply with discovery requirements, the trial court may order compliance, exclude the evidence, or order any appropriate relief. *Marts v. State*, 332 Ark. 628, 968 S.W.2d 41 (1998). Though information held by police officers is imputed to the prosecuting attorney, a failure to disclose that information will not warrant a reversal of a conviction absent a showing of prejudice. *Id.*

 While we agree with Flanagan that the State should have disclosed the rough notes earlier than three days into the trial, we cannot reverse because Flanagan has failed to show that she was prejudiced by the late disclosure. In view of the overwhelming proof of Flanagan's guilt, the prejudicial impact, if any, of the State's late disclosure, was insignificant.

*F. Amending the Felony Information*

Flanagan argues that the circuit court erred in allowing the State to amend the felony information by adding the language "or an accomplice." Flanagan does not develop this argument or explain how she was prejudiced by the amendment. As previously noted, this court does not develop arguments for appellants. *See, e.g., Hathcock, supra.* We add that the State is entitled to amend an information at any time prior to the case being submitted to the jury so long as the amendment does not change the nature or degree of the offense charged or create unfair surprise. *DeAsis v. State*, 360 Ark. 286, 200 S.W.3d 911 (2005).

*G. Jury Instructions*

Flanagan argues that the circuit court erred in its rulings on jury instructions regarding accomplice liability, both generally and with respect to each lesser-included offense. Flanagan does not explain how the circuit court erred, nor does she explain how she was prejudiced by the circuit court's rulings. This court cannot address arguments that Flanagan does not make.

*H. Denial of Motion for New Trial*

Flanagan argues that the circuit court erred in denying her motion for new trial, but she does not explain how the circuit court erred, nor does she explain how she was prejudiced by the circuit court's denial of her motion. Again, we do not develop arguments for appellants.

 In sum, with respect to Flanagan's final point on appeal — her allegation of cumulative error — she has failed to demonstrate any reversible error. This court does not recognize

the cumulative-error doctrine when there is no error to accumulate. *See Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000); *Nooner v. State*, 322 Ark. 87, 907 S.W.2d 677 (1995).

*VI. Rule 4-3(h)*

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Flanagan, and no prejudicial error has been found.

Affirmed.

CORBIN and IMBER, JJ., dissent.

ANNABELLE CLINTON IMBER, Justice, dissenting. Once again, the majority concludes, as it did in *Anderson v. State*, 367 Ark. 536, 242 S.W.3d 229 (2006), that the circuit court did not err when it allowed the jury to take Flanagan's recorded statements and a tape recorder or a TV/VCR into the jury room where the jury was deliberating. I must respectfully dissent in this case for the reasons stated in my dissenting opinion in *Anderson v. State, supra.*

CORBIN, J., joins this dissent.