BRANDON J. HARRISON, Judge
Vernyell Mosby was convicted of two counts of first-degree murder and now appeals, arguing that the circuit court erred in (1) denying his motion for directed verdict, (2) denying his motion to suppress, (3) not allowing the testimony of Dr. Joseph Drumm at the suppression hearing or at trial, and (4) finding that certain statements made to Mosby by a police officer were inadmissible hearsay. We affirm.
Mosby was charged with two counts of capital murder for the deaths of Michael Reeves and Kentarrious Madden. Generally, the State alleged that on 11 June 2015, Mosby shot Reeves, who had recently started dating Mosby's ex-girlfriend, and Reeves's friend, Madden, and then concealed the bodies in his home.
After a four-day jury trial in August 2016, Mosby was convicted of two counts of first-degree murder and sentenced to an aggregate term of forty-five years' imprisonment. Mosby filed a timely notice of appeal from his convictions. Specific facts related to each point on appeal will be discussed below.
I. Sufficiency of the Evidence
This court treats a motion for directed verdict as a challenge to the sufficiency *81 of the evidence. See Tubbs v. State , 370 Ark. 47, 257 S.W.3d 47 (2007). In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by substantial evidence, direct or circumstantial. Id. Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. Id. This court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. Id. The credibility of witnesses is an issue for the jury and not the court. Morgan v. State , 2009 Ark. 257, 308 S.W.3d 147. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. Id.
At trial, the State presented the following evidence in support of the verdict:
Martavieon Ward, Reeves's cousin, testified that he knew Mosby from playing basketball but did not know him very well. Ward said that Reeves began dating Korea Myles, Mosby's girlfriend, in June 2015, and that Mosby confronted him (Ward) about it. In a June 8 telephone conversation, Mosby told Ward that "[h]e wasn't gonna let a young n* * * * take his old lady."
Korea Myles testified that in June 2015, she and Mosby had been together almost eight years and have two children together. Myles had begun dating Reeves in April 2015, and she moved out of Mosby's home in early June. From late May 2015 until approximately June 10, Myles and Mosby exchanged many text messages in which Mosby expressed his displeasure with the breakup.
On June 11, Myles listened to a telephone conversation between Reeves and Mosby that Reeves had put on speaker; in that conversation, Mosby asked Reeves to meet him at an apartment complex near his (Mosby's) house. Myles advised Reeves not to go, but Reeves said that he would go and that he and Mosby had met twice before without incident. Later that afternoon, Myles was unable to reach Reeves on his cell phone. Myles called Mosby and planned to stop by his house, but he told her to "give him a little while." She went to his house anyway, but he refused to let her enter the house. Approximately two hours later, Myles successfully entered the home and saw that the carpet in the house had been ripped up and piled in the kitchen.
Myles left the home to pick up her children and intended to return to the home, but she was stopped by Officer Ricky Cantrell with the Dumas Police Department. Myles asked Cantrell to go to Mosby's house and check things out because Mosby had been "acting weird." Myles advised Cantrell to "check the carpet."
Scott Rosegrant, a criminal investigator with the Arkansas State Police, testified that the Dumas Police Department requested his assistance with their investigation in the early morning hours of June 12 and that he interviewed Mosby later that morning. Rosegrant was present when another officer explained to Mosby his Miranda rights, and the entire interview was video and audio recorded. The State then played the video of the officers' interview with Mosby in which he explained that he had met Reeves and Madden near his home and that the three men returned to his home to talk. After approximately thirty minutes, "[a]ll the sudden tempers flared," and Madden charged toward him. Mosby grabbed a gun from under a pillow on his loveseat, and he and Madden began "tussling." While they were fighting, the gun went off and Reeves was shot. A second shot hit Madden in the stomach, and Mosby fired a third shot toward Madden as he was falling. According to Mosby, *82 he then went into "straight panic mode." He disposed of his gun in a trash bag and put it in the bed of a truck parked at a nearby Dollar General, and he wrapped the bodies in sheets, tied them with extension cords, and pulled up all the carpet and piled it on top of the bodies.
At the conclusion of the video, Rosegrant continued his testimony and said that on August 4, he was advised by Mosby's attorney that Mosby's brother, Camdon Mosby, was in possession of the firearm used in the murders. Rosegrant met with Camdon and recovered the firearm the next day.
Jermaine Cobbs, Mosby's older brother, testified that on June 11, he had stopped by Mosby's house in the early evening and saw that all the carpet had been pulled up. Mosby told him that he (Mosby) was remodeling. Later that evening, Cobbs's son informed him of several police cars at Mosby's residence, so Cobbs returned to Mosby's house. Cobbs saw Officer Ricky Cantrell, who was a good friend of his, and Cantrell told Cobbs that Mosby was not talking to anyone and asked Cobbs, "Do you think you can talk to him and see what's going on?" According to Cobbs, "So we went to the side, me and Ricky. I said, 'Brother, whatever's going on, tell him. And that's when he said, 'It was two inside.' " Cobbs said he understood that to mean that there were two bodies inside the house. Mosby was then taken into custody.
Camdon Mosby, Mosby's younger brother, testified that on the afternoon of June 11, Mosby called him and said that he needed a truck. When Camdon arrived later that afternoon, a truck was there, and Mosby told him (Camdon) that there were two dead bodies in the house. Camdon also said that Mosby had given him a gun wrapped in a plastic bag that evening and that he (Camdon) had taken the gun home and "kept it put up" until giving it to Rosegrant. Camdon also explained that on June 11, he had called Officer Ricky Cantrell at Mosby's request because of the fighting between Mosby and Myles.
Chuck Blevins, an investigator with the Dumas Police Department, testified that he searched Mosby's house in the late-night hours of June 11 and that he found the bodies of Reeves and Madden in the kitchen. According to Blevins, the bodies were wrapped in sheets, tied with extension cords, and concealed under a pile of carpet.
After the State rested, Mosby moved for a directed verdict as follows:
There is insufficient evidence from which the jury could conclude that Vernyell Mosby is the one who committed these murders. The evidence appears that they were the result of a homicide. That they occurred in Vernyell's home, but there is no physical evidence connecting him to the deaths of these two young men. No fingerprints on a weapon, no gunpowder residue on his hands that he even fired a weapon, no tracing of the weapon from when it was sold to him.
All they-their whole case is based upon a confession that they got from him where he does admit pulling a gun in response to an assault or rush, he called it. The State's contending that that's a false statement, but they want to pick out what they say is true, and that he produced the gun. The rest of it is to whether he intended to kill anybody is based upon pure conjecture. That's all they have in this case is conjecture and circumstantial evidence that's insufficient to show that-where a jury can find that someone else did not commit this offense. ... [T]hey don't have a confession to intentionally killing anybody.
*83 Mosby's motion was denied, as was the renewal of the motion after the defense had presented its case. The jury found Mosby guilty of first-degree murder.
A person commits murder in the first degree if, with a purpose of causing the death of another person, the person causes the death of another person. Ark. Code Ann. § 5-10-102(a)(2) (Supp. 2017). A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1) (Repl. 2013). A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. Scott-Paxson v. State , 2015 Ark. App. 149, 457 S.W.3d 311. Our supreme court has recognized that the intent necessary for first-degree murder may be inferred from the type of weapon used, from the manner of its use, and the nature, extent, and location of the wounds. Id.
Mosby's challenge to the sufficiency of the evidence is his third point on appeal, but double-jeopardy considerations require this court to review a challenge to the sufficiency of the evidence before we review the other issues on appeal. Jones v. State , 349 Ark. 331, 78 S.W.3d 104 (2002). On appeal, Mosby makes two assertions: (1) the evidence was insufficient to prove that it was him, and not someone else, who caused the deaths of Reeves and Madden; and (2) there was no evidence that he had planned to kill the two men. The State disagrees and argues that the jury did not have to speculate or resort to conjecture to conclude that Mosby killed the victims. The State contends that the evidence of guilt, including Mosby's own admission, is overwhelming.
Considering the evidence in the light most favorable to the verdict, as we must, we hold that there is substantial evidence to support the verdict. According to Mosby's own confession, he was alone with the two victims and shot them, and the fact that he asked the men to return to his house and had a gun hidden within reach is evidence that he planned the murders. Thus, we affirm on this point.
II. Motion to Suppress
Before trial, Mosby moved to suppress any statement he made at the time of his arrest and his subsequent statement given to the police when he was interviewed on June 12. Mosby asserted that at the time of his arrest, Officer Ricky Cantrell promised to "help him out" if he would "give his side of the story"; in doing so, Cantrell "unconstitutionally counseled" Mosby. He also claimed that at the time of his interview on June 12, he had not slept for nearly twenty-eight hours and "was obviously very disturbed mentally and emotionally, suffering from extreme emotional trauma." Mosby argued that his statement was not freely and voluntarily given because "he was obviously not mentally and emotionally capable of understanding or excercising his right to remain silent, nor did he have the ability to give a true statement."
At the suppression hearing, Dumas police officer Ricky Cantrell testified that he had known Mosby and his family for years. On the night of 11 June 2015, Cantrell was off duty and at home when he was contacted by Camdon Mosby and went to the defendant's home at Camdon's request. Cantrell was in plain clothes and unarmed, but he did drive his patrol car to the house. When he arrived, he spoke to Mosby outside the house, and Mosby told him that he and his girlfriend had been in an altercation and that he did not want her to *84 return to his house. The men saw his girlfriend, Myles, pull up to a stop sign near the house, and Cantrell volunteered to stop Myles and ask her not to return to the house. During Cantrell's conversation with Myles, she told him that she thought something was wrong at Mosby's house.
Cantrell returned to Mosby's house, went inside, and looked around with Mosby's permission. He noticed all the carpet was ripped up and piled in the kitchen, which Mosby said was the result of remodeling. Cantrell left the house and drove home, but he "had a funny feeling to go back," so he returned to Mosby's house and called some patrol officers to meet him there. Cantrell asked if he could look in the house again, but Mosby said he would have to get a search warrant. Cantrell called for a warrant and waited outside along with Mosby and Jermaine Cobbs, Mosby's brother, who had arrived. Cantrell said he asked Cobbs, as a friend, to talk to Mosby with him. Cantrell said to Mosby, "You know if something-if y'all had some kind of altercation and something is wrong, you know, we can't help anybody until, you know, you let us know what was going on." In response, Mosby told him there were bruises and evidence on his arms and "there's two bodies in the house." Cantrell then called over the other officers, who placed Mosby in custody. Cantrell said that at the time he asked Mosby for his side of the story, he was unaware that a crime had been committed, and he was talking to Mosby as a friend.
Keith Finch, an investigator with the Dumas Police Department, testified that he Mirandized Mosby when he arrived at the police station on the night of June 11, but before his interview could proceed, Finch was told to stop because the state police had been called to assist. Mosby was transported back to his home to sign a consent to search and returned to the police station. The morning of June 12, Finch and Scott Rosegrant interviewed Mosby, and Mosby was again Mirandized. Mosby indicated that he understood his rights and agreed to speak to the officers. Finch denied threatening or coercing Mosby in any way and described Mosby's demeanor as quiet and reserved.
Scott Rosegrant testified that he interviewed Mosby along with Finch on June 12, and the video of the interview, as decribed previously, was played for the court. Rosegrant denied threatening, coercing, intimidating, or making any promises to Mosby.
Mosby testified that he witnessed another man, Keith Bryant, murder Reeves and Madden. He did not report it to authorities because Bryant had threatened him and pointed a gun at him. After witnessing the killings, he "wasn't in [his] right mind" and felt a "real bad state of panic, fear." Mosby said that he knew Ricky Cantrell and that Cantrell was there at his house that night as a friend. According to Mosby, Cantrell asked him if there were bodies in the house, and Mosby nodded his head yes and held up two fingers. Mosby said he did not tell the truth in the June 12 interview with the police because Bryant "was out there, and my kids were so close by." Mosby also agreed that he would not have talked to the officers on the morning of June 12 if he had not been encouraged by Cantrell to talk and tell his side of the story. He also said that Cantrell had promised to help him.
Jermaine Cobbs testified that Cantrell was a good friend and that Cantrell had asked him to talk to Mosby the night of June 11. Cobbs said that Cantrell was still a good friend and that he (Cobbs) had no qualms with anything that Cantrell did in this case.
In its ruling, the circuit court found, with regard to Mosby's statement to Ricky *85 Cantrell, that Cantrell did not have sufficient knowledge or suspicion to constitute probable cause to make an arrest before Mosby's statement. The court also found that Cobbs had encouraged Mosby to tell Cantrell what was going on. As to Mosby's recorded interview, the court found that Mosby was "an intelligent young man" and "he thoroughly understood what was being transpired." Thus, the circuit court denied the motion to suppress.
On appeal, Mosby argues that Cantrell's comments at the scene should be characertized as "admonitions, with an offer of help, by Cantrell were placed in Appellant's mind and stayed there into his interview with the police officers only a few hours later[.]" After a lengthy block quote discussing promises of reward by police officers, Mosby argues that "[t]he State failed to show, under the totality of the circumstances, that the Appellant's statements to the police on June 11 and 12, 2015, were freely and voluntarily made."
In response, the State first asserts that the circuit court did not rule on this particular argument, so it is not preserved for our review. Alternatively, the State argues that Mosby has failed to show how any vague offer of help by Cantrell could influence or invalidate his interview with different police officers, which was conducted after he had been given Miranda warnings.
A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily. Bell v. State , 371 Ark. 375, 266 S.W.3d 696 (2007). In Grillot v. State , 353 Ark. 294, 107 S.W.3d 136 (2003), our supreme court clarified the appropriate standard of review for cases involving a circuit court's ruling on the voluntariness of a confession-we make an independent determination based on the totality of the circumstances. We review the circuit court's findings of fact for clear error, and the ultimate question of whether the confession was voluntary is subject to an independent, or de novo, determination by the appellate court. Clark v. State , 374 Ark. 292, 287 S.W.3d 567 (2008).
To determine whether a waiver of Miranda rights is voluntary, knowing, and intelligent, we look to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. Flanagan v. State , 368 Ark. 143, 243 S.W.3d 866 (2006). To make this determination, we review the totality of the circumstances surrounding the waiver including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. Id. We will reverse a circuit court's ruling on this issue only if it is clearly against the preponderance of the evidence. Id. Evaluating the credibility of witnesses who testify at a suppression hearing about the circumstances surrounding an appellant's custodial confession is for the circuit court to determine, and this court defers to the circuit court in matters of credibility. Shields v. State , 357 Ark. 283, 166 S.W.3d 28 (2004).
Considering the evidence presented at the suppression hearing and our standard of review, we affirm the denial of the motion to suppress. From its order, it appears that the circuit court believed that Cantrell was there that night as a friend and had not improperly induced Mosby into making any sort of statement against his own interest. While Mosby now claims *86 on appeal that Cantrell's promise of help somehow influenced his decision to submit to an interview with different officers the next morning, there is no basis in the record to support this assertion. In addition, the court found that Mosby understood his Miranda rights and voluntarily made a statement, and Mosby does not articulate any real challenge to that finding.
III. Dr. Drumm's Testimony
On 28 July 2016, the State moved to exclude the testimony of Dr. Joseph Drumm, a psychiatrist who had performed a "forensic neuropsychiatric assessment" of Mosby. According to the State, Drumm offered opinions as to the truth or falsity of Mosby's statements[1] to the police, and the State argued that such testimony was inadmissible.
At the suppression hearing, also held on July 28, there was lengthy discussion between the attorneys and the court concerning Drumm. The State clarified that it objected on relevance grounds to Drumm testifying at the suppression hearing. The court expressed doubt that it needed expert testimony to decide the motion to suppress, but defense counsel argued that the court should have "expertise to determine whether or not somebody's been compelled because of some mental defect or emotion." The State maintained that Drumm's testimony was irrelevant and that the best evidence was the video of the interview and the testimony of the other witnesses. The court ultimately ordered both sides to brief the issue and reserved ruling on the admissibility of Drumm's testimony. Mosby filed a brief on August 2; there is no brief from the State in the record.
At a second hearing on August 5, the court announced that since the last hearing, it had reviewed the transcript and the briefs by the parties and had done some research of its own. After hearing further arguments from counsel, the court found that "the issue before us today, before us in this motion to suppress, are factual issues which can be decided on without expert testimony." When asked to clarify, the court stated that the primary issue was voluntariness and that expert testimony was not necessary.
During the trial, defense counsel again sought to introduce Drumm as a witness: "We are offering Dr. Drumm's testimony regarding the defendant's psychological characteristics that would make him prone to giving in to interrogation against his free and voluntary will and his tendency to make a false confession under such circumstances." In his proffered testimony, Drumm explained that he had performed a psychiatric evaluation of Mosby in July 2016 and that Mosby was diagnosed with posttraumatic stress disorder, generalized anxiety disorder, agoraphobia, and major depressive disorder. Drumm opined that the murders of Reeves and Madden had caused Mosby's stress disorder and that experiencing that type of stressor could "absolutely" affect his ability to give a voluntary statement. Defense counsel reiterated to the court that it was offering Drumm's testimony "to assist the fact-finder in reaching a decision on the facts involving voluntariness of a confession." The State expressed confusion, arguing that voluntariness had been decided at the suppression hearing. Defense counsel insisted that the jury could decide "in the trial whether or not he was testifying freely and *87 voluntarily and unaffected by any pressure." Continuing the proffer, on cross-examination Drumm said that he had not watched the video of Mosby's interview with the police but he had read the transcript.
Court adjourned until the following day, at which time the court gave its ruling:
[T]he Court's of the opinion that the jury of 12 persons, through their deliberations-first of all, the issues are common and everyday issues, for the
most part, everyday people deal with. And the Court's of the opinion that the issues pertaining to-that were raised in the motion to suppress, as well as during the testimony during the trial phase of this trial, are issues that the jury is competent to address and draw their own conclusions. And the testimony in this particular case is unlikely to be able to assist this jury, and the Court's opinion is it invades the province of this jury to make decisions pertaining to the issues that have arisen or will arise during the course of this trial.
And for that reason, the Court finds that the expert testimony is inadmissible.
On appeal, Mosby asserts that the circuit court erred in not allowing Dr. Drumm to testify at the suppression hearing or at trial. Matters pertaining to the admissibility of evidence are left to the sound discretion of the circuit court, and we will not reverse absent an abuse of discretion. Moore v. State , 2017 Ark. App. 39, 511 S.W.3d 880. Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision; it requires that the circuit court acted improvidently, thoughtlessly, or without due consideration. Hajek-McClure v. State , 2014 Ark. App. 690, 450 S.W.3d 259. Generally, the admissibility of expert testimony depends on whether the testimony will aid the fact-finder in comprehending the evidence presented or resolving a fact in dispute. Wood v. State , 75 Ark. App. 22, 53 S.W.3d 56 (2001).
A. Suppression Hearing
Mosby argues that expert testimony on the effects of sleep deprivation and the existence of any mental or emotional disorder would have assisted the circuit court in determining whether his confession was freely and voluntarily given and that the court's refusal to consider Drumm's testimony was a "gross abuse of discretion." The State counters that the circuit court watched the video of Mosby's interview and observed firsthand his demeanor and ability to relate his account of the shooting; the court also heard Mosby's own testimony at the suppression hearing and judged his credibility accordingly. The State insists that the circuit court certainly acted within its discretion in deciding that Drumm's testimony was not necessary in deciding the voluntariness of the statement.
We hold that the circuit court was in the best position to observe Mosby's demeanor and mental state, both on the videotape and at the hearing, and did not need the assistance of any expert testimony. In addition, given the time and consideration that the circuit court devoted to this decision, it certainly cannot be said that the court acted improvidently, thoughtlessly, or without due consideration.
B. Trial
In his argument, Mosby states that the purpose of Drumm's testimony "was to assist the jury in determining whether Appellant's videotaped statement given to the police on June 11, 2015, was a true statement." However, he also asserts that Drumm "was not going to be asked to give his opinion on whether [Mosby] was *88 lying or being truthful in his differing statements. He was only being called to testify on the voluntariness of his statements to the police." As persuasive authority, Mosby cites two cases from other jurisdictions: United States v. Hall , 93 F.3d 1337 (7th Cir. 1996), and State v. Baldwin , 125 N.C.App. 530, 482 S.E.2d 1 (1997).
In Hall , a defendant convicted of kidnapping argued that the trial court erred in excluding expert testimony that would have supported his claim that his confession was false. In that case, the defendant's entire defense "boiled down to a simple proposition: due to a personality disorder that makes him susceptible to suggestion and pathologically eager to please, he 'confessed' to a crime that he did not really commit, in order to gain approval from the law enforcement officers who were interrogating him." 93 F.3d at 1341. The defendant wanted to present testimony from a psychologist and a psychiatrist about false confessions. Id. In reversing the defendant's conviction and remanding for a new trial, the court of appeals noted that, although the trial court determined that the defendant's confession was voluntary, it was within the jury's province to assess the truthfulness and accuracy of the confession. Id. at 1344. The court of appeals held that the testimony would have assisted the jury in making its decision "because juries are unlikely to know that social scientists and psychologists have identified a personality disorder that will cause individuals to make false confessions." Id. at 1345.
In Baldwin , the defendant was charged with first-degree felony murder and attempted to introduce expert psychiatric testimony about his psychological characteristics that would make him more prone to making a false confession in police interrogation. 482 S.E.2d at 3. The trial court sustained the State's objection to this evidence on the grounds that it was inadmissible character evidence. The North Carolina Court of Appeals reversed, holding that "Dr. Hoover did not seek to provide a 'generalized description' of the defendant's 'disposition.' His testimony instead related to psychological factors affecting the defendant's mental condition and the trial court erred in excluding the testimony on the grounds that it was prohibited character evidence." Id. at 5.
In response, the State again argues that whether his statement was voluntary was a question of law for the court to decide, which it did decide at the suppression hearing. The State further notes that although Drumm opined that Mosby was incapable of giving a voluntary or truthful statement on June 12, Drumm had never watched the video of the interview and had therefore never observed Mosby's actions or demeanor during that interview. In contrast, argues the State, the circuit court and the jury "had the advantage of seeing exactly how appellant conducted himself and spoke and the nature of the questioning during the interview." The State contends that the circuit court acted within its discretion when it determined that the issue presented was not one beyond the realm of common knowledge and that Drumm's testimony would not only be unlikely to assist this jury, it would invade the province of the jury.
The State also asserts that Hall and Baldwin are distinguishable. In Hall , the officers knew that Hall had mental problems and suggested the "right" answers to him. And in Baldwin , the officers falsely told Baldwin that his hair and fingerprints were found on the victim's body and he eventually confessed, but he later claimed he was at another location at the time of the murder. Here, the murders occurred inside Mosby's home, where he was undoubtedly *89 present, and he was arrested outside his house on the day of the shooting after stating that bodies were inside. And his interview with police was conducted only hours later.
We hold that the circuit court did not abuse its discretion when it found that the case involved issues that the jury was competent to address and draw its own conclusions. We agree with the State that voluntariness of the statement had already been decided by the court, and the credibility of the statement was within the province of the jury. See Hinkston v. State , 340 Ark. 530, 10 S.W.3d 906 (2000) (affirming the exclusion of expert testimony to show that the defendant's inconsistencies were attributable to his mental deficits and explaining that expert testimony on the credibility of witnesses is an invasion of the jury's province). Hall and Baldwin are distinguishable; in Hall , the defendant had a history of mental-health problems, he was questioned for approximately seventeen hours, and there was no audio or video recording of the interview. And Baldwin was decided on whether the doctor's testimony constituted character evidence, which is not at issue in this case.
IV. Hearsay
After Mosby had been arrested at his home, he was transported to the police station by Dumas police officer Theo Weathers. Mosby attempted to testify about something Weathers said to him during that transport, but the State objected on hearsay grounds, and the court sustained the objection. Mosby was allowed to testify that Weathers "told [him] something to do" and that as a result of that conversation, he decided to "make up a self-defense story." Mosby later proffered this testimony:
He told me when he was taking me to jail, he said, "I been knowing y'all for a long time, you and your family, since y'all been kids." And he said, "I know y'all are good people." He said, "You got to tell them something." He said, "You still have a chance to have a life, but you have to tell them something." And then, he said, "Whether it was just self-defense or whatever the case may be, you need to tell them something."
"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Ark. R. Evid. 801(c) (2017). Matters pertaining to the admissibility of evidence are left to the sound discretion of the circuit court, and we will not reverse absent an abuse of discretion. Moore , supra.
On appeal, Mosby argues that Weathers's statement to him was not offered for the truth of the matter asserted. Mosby asserts that Weathers's statement "arguably had the tendency to, not only suggest, but advise the defendant to give a statement. They at least planted a seed to fabricate a self defense story." He also contends that he was prejudiced by the exclusion of Weathers's statement because "if the jury had been permitted to hear and consider this evidence, which was not hearsay, the verdict would have very likely been different."
The State responds that Weathers's statement was offered for the truth of the matter asserted: "Appellant intended to portray as true that Weathers had actually made that statement to him and that he had acted on it by inventing a self-defense version of the shooting." The State also contends that any error was harmless because it was clear from Mosby's testimony that he claimed he acted in self-defense based on Weathers's advice.
We hold that the circuit court did not abuse its discretion in making its ruling. It was clear from Mosby's testimony that he *90 "made up" a self-defense story based on Weathers's advice. We therefore affirm on this point.
Affirmed.
Gruber, C.J., and Glover, J., agree.

According to the State, in addition to the recorded statement played at trial, Mosby gave a second statement to police in which he denied committing the murders. This statement was not introduced at trial.